## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| *MARISSA SANCHEZ*, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>*WALMART INC.*,<br><br>    Defendant. | Case No.:<br><br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Marissa Sanchez, individually and on behalf of all others similarly situated, ("Plaintiffs") by her undersigned counsel, brings this class action complaint against Defendant Walmart Inc., ("Defendant" or "Walmart"), and alleges upon personal knowledge as to her acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys.

## <u>NATURE OF THE SUIT</u>

1.      Walmart charges a premium for its frozen Great Value and Sam's Choice products[1] that uniformly promise to be "certified sustainable seafood" supported by a prominent certification from the Marine Stewardship Council ("MSC") in the form of a blue stamp (referred to hereinafter as the "Blue Tick") on the Product labels (hereinafter, the "Sustainability Promise").

---

[1] As described herein, Products refer to Great Value Pink Salmon Fillets, Fish Fillets, Fish Sticks, Wild Caught Skinless Haddock Fillets, Pacific Cod Skinless Fillets and Sam's Choice products including Alaska Cod Loins, North Atlantic Cold Water Lobsters, North Atlantic Cold Water Lobster Tails with Butter, Snow Crab Legs, Sea Scallops, Wild Alaskan Sockeye Salmon sold nationwide. The labels of the different varieties of Products are substantially similar in the representations made to consumers.

2.      The prominent Sustainability Promise found on each and every Product label deceives and misleads reasonable consumers into believing the Products are sourced from sustainable fishing practices. However, Walmart turns a blind eye to the unsustainable fishing practices used in sourcing its Products and deceptively uses the Sustainability Promise with the Blue Tick as proof of sustainable fishing methods. However, as Walmart knew or should have known, MSC hands out this certification to those who use industrial fishing methods that injure marine life as well as ocean habitats with destructive fishing methods. MSC also allows its members to obtain their certification with a paid membership, creating a potential conflict of interest.

3.      Despite the MSC certification, Walmart sources its Products using fishing practices that indiscriminately harm ocean ecosystems. Walmart knows that conscientious consumers go shopping in search of sustainable products, which, in turn, drives market share. Reasonable consumers believe the fisheries providing these Products are maintaining healthy fish populations and protecting ecosystems. In fact, the MSC standards themselves promise such protections for the oceans, marine life, and humans. However, MSC certified fisheries do not provide these promised protections and, instead, engage in the following conduct, which indisputably defies its promise of sustainability: the suffocation and crushing of dolphins caught in fishing nets that are then hauled onto fishing boats while severely injured or dead; the torturously slow death of endangered sea turtles after getting caught on large hooks meant for haddock; and the entangling of critically endangered whales by fishing gear causing deep wounds and intense suffering.

4.      No reasonable consumer would believe the Products to be "sustainable" if they knew of these fishing practices utilized in sourcing the Products.

5. In addition to violating the reasonable consumer's expectations with respect to sustainability, Walmart knew or should have known that the Products are sourced in violation of its certifying body's—MSC's—*own standards*.

6. Reasonable consumers are not required to look beyond the label representations to understand a company's label promises—here, the prominent Sustainability Promise. One need look no further than MSC's hollow promises of sustainability, which confirm a reasonable consumer's basic expectations of sustainability in purchasing allegedly "sustainable" products.[2]

7. It, therefore, shocks the conscience to learn that Walmart uses the hollow certification provided by MSC, an organization which Walmart knows or should know blatantly violates its own standards and puts the very ecosystem MSC feigns to protect in serious danger.

8. Walmart's failure to ensure that the Sustainability Promise was truthful is a violation of the explicit promises that it made to consumers on each and every Product label. Consumers reasonably expect that Walmart has the proper, company-wide monitoring in place to verify the explicit promise it made to consumers regarding the sustainability of the fishing practices used to source the Products. Instead, Walmart failed to ensure that the fisheries *only* sourced using sustainable means, making its promises meaningless.

9. Sadly, despite profiting off of the false and misleading Sustainability Promise, Walmart does not promote the health and preservation of marine ecosystems—a basic pillar of sustainability. Indeed, Walmart conceals the use of harmful fishing practices used for its Products, thereby making the Products more appealing to an ever-growing environmentally conscious consumer base. By failing to disclose that its Products are, sadly, unsustainably sourced through

---

[2] https://www.msc.org/en-us/about-the-msc (last visited Feb. 16, 2023) (highlighting protection of healthy fish populations, careful management of ecosystems, and adaptations to changing environmental circumstances).

the use of fishing methods that harm ocean habitats and marine life, Walmart has induced reasonable consumers, like Plaintiffs and Class Members, to become unwitting participants in the very environmental crisis they attempt to avoid by purchasing and paying a premium for Walmart's Products.

10.     Due to Walmart's false and deceptive labeling, Plaintiff and reasonable consumers purchased Products based upon their reliance on Walmart's Sustainability Promise. Had Plaintiff and Class Members been aware that Walmart's fishing techniques used to source the Products are not sustainable, Plaintiff and Class Members would not have purchased the Products or would not have paid more for the Products. Accordingly, Plaintiff and Class Members have been injured by Walmart's deceptive business practices.

## JURISDICTION AND VENUE

11.     The Court has original jurisdiction under 28 U.S.C. § 1332(d)(2) because the matter in controversy: (1) is a class action involving more than 100 class members, (2) involves members of a proposed class with citizens of states that are different from Walmart's home state, and (3) exceeds the sum or value of $5,000,000, exclusive of interests and costs.

12.     This Court has personal jurisdiction over Walmart because Walmart conducts and transacts substantial business in Illinois. Walmart has intentionally and purposefully marketed, promoted, distributed, and sold the Products at issue in Illinois, rendering exercise of jurisdiction by Illinois courts permissible.

13.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiff's and Class Members' claims occurred in this District.

## PARTIES

### Plaintiff

14.     Plaintiff Marissa Sanchez resides in Chicago, Illinois and is a citizen of Illinois. Throughout the relevant period, Plaintiff Marissa Sanchez purchased the Products at issue in this lawsuit and was exposed to and reasonably relied upon Walmart's "sustainable" representation. Specifically, Plaintiff Sanchez purchased Walmart Great Value, frozen Pink Salmon, frozen Pacific Cod, and Breaded Fish Sticks from a local Chicago, Illinois Walmart store numerous times in 2022. Plaintiff Sanchez specifically recalls viewing the "sustainable" labeling on the Products' packaging and selected the Products in reliance on the sustainable language. In reasonable reliance on the Sustainability Promise, Plaintiff Sanchez paid an increased cost for the Products, which were worth less than represented because the statements were not true and were highly misleading. Walmart's Sustainability Promise was part of the basis of the bargain in that Plaintiff Sanchez attributed value to Walmart's Sustainability Promise and Plaintiff Sanchez would not have purchased the Products, or would not have purchased them on the same terms, if she knew the Sustainability Promise was untrue and/or misleading. Plaintiff Sanchez paid a price premium for empty promises of sustainability that Walmart did not keep. Had Plaintiff Sanchez been aware that the "sustainable" representations made by Walmart were untrue, she would have paid less for the Products, or not purchased them at all.

### Defendant

15.     Walmart Inc., formerly known as Wal-Mart Stores, Inc. ("Walmart"), is incorporated in Delaware with its principal place of business in Bentonville, Arkansas. Walmart transacts, or has transacted, business in this District, as well as throughout the United States and worldwide.

**FACTUAL BACKGROUND**

**I.      Walmart's Line of "Sustainable" Seafood Products**

16.      Walmart markets, distributes, and sells its Products at its brick-and-mortar stores and on its online marketplace.

17.      All of Walmart's Products uniformly tout the Sustainability Promise on the front of the product packaging where it cannot be missed by consumers. Examples of these representations on Walmart's Products can be seen in the images below:



  

18.      Federal guidance and consumer research demonstrate that sustainability claims, like those proffered by Walmart, suggest to reasonable consumers that the Products are sourced through sustainable methods and in accordance with fishing techniques that promote healthy

ecosystems. MSC itself highlights maintenance of healthy fish populations and careful management of ecosystems as pillars of sustainable fishing practices.[3] As detailed in Section II, no reasonable consumer would consider fishing with purse seiners, gillnets, pelagic trawlers, bottom trawlers, and longlines to be "sustainable."

19.     The Federal Trade Commission's ("FTC") Green Guides ("Green Guides") were codified to "help marketers avoid making environmental marketing claims that are unfair or deceptive" based on its "views on how reasonable consumers likely interpret [those] claims."[4] The Green Guides are strong indicators of a reasonable consumer's understanding of sustainability practices.

20.     The FTC determined that "[u]nqualified general environmental benefit claims . . . likely convey that the product . . . has specific and far-reaching environmental benefits and may convey that the item . . . has no negative environmental impact."[5] For that reason, the FTC has cautioned against the use of claims, such as "sustainable," because "it is highly unlikely that [companies] can substantiate all reasonable interpretations of these claims."[6] In fact, the FTC has warned that "[m]arketers still are responsible for substantiating consumers' reasonable understanding of these claims."[7]

---

[3] What is the MSC?, https://www.msc.org/en-us/about-the-msc.

[4] FTC Green Guides, 16 C.F.R. § 260.1(a), (d) (2012).

[5] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, Federal Trade Commission (Apr. 2, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/04/ftc-sends-warning-letters-companies-regarding-diamond-ad-disclosures (last visited January 30, 2023); *see* also FTC Green Guides, 16 C.F.R. § 260.4(b) (2012).

[6] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, *supra* n.5.

[7] FTC, The Green Guides, Statement of Basis and Purpose, pg. 258 (Oct. 1, 2012) https://bit.ly/2TQ7GL9 (last visited January 30, 2023).

21.     Research demonstrates that claims related to sustainability are perceived by many consumers to mean "produced according to higher animal welfare standards."[8] Consumers have ranked "no pollution to the environment" and "respect to fish welfare" as two of the four most important elements of sustainable aquaculture.[9]

22.     Consumers associate the term "sustainable" with environment and atmosphere preservation (80%), animal welfare and protection (76%), environmental packaging (53%), and advocacy for human rights and ethical treatment of workers.[10]

23.     A study on consumer perception of the phrase "ecologically sustainable" found that a majority of consumers "expect eco-labelled seafood to be harvested in a way that reduced impact on the fish population or the marine environment."[11] And, out of 235 responses, only four percent "expressed skepticism about the term ['ecologically sustainable']" and felt that "it was primarily a marketing term without real meaning."[12]

## II.     Walmart's False and Deceptive Advertising Suggests to Consumers that Its Products are Protective of Fish Stocks, Marine Life, and Human Laborers

24.     Walmart, through the Sustainability Promise that appears on all its Products, has consistently conveyed to consumers that its sustainably sourced Products promote the protection of fish stocks, marine life, and ocean habitats.

---

[8] Katrin Zander *et al.*, *Consumers' Willingness to Pay for Sustainable Seafood Made in Europe*, 30 J. Int'l Food & Agribusiness Marketing 251 (Dec. 22, 2017).

[9] *Id.*

[10] Krystle Morrison, *How Do Consumers Really Feel About Sustainability?*, Food Industry Executive (Jan. 25, 2022) https://foodindustryexecutive.com/2022/01/how-do-consumers-really-feel-about-sustainability/ (last visited January 30, 2023).

[11] Loren McClenachan *et al*., *Fair Trade Fish: Consumer Support for Broader Seafood Sustainability*, 17 FISH & FISHERIES 825 (Sept. 2016).

[12] *Id.*

25.     Walmart is well aware of consumers' concerns about—and preferences for—sustainable food products. The content of Walmart's website demonstrates its understanding that its consumers consider sustainable food products to be important. On its website, Walmart confirms its Sustainability Promise, stating that the Products are sourced from "seafood suppliers who are dedicated to providing the highest in quality and safety through practices that promote sustainable fisheries" and that the Products are "sustainable seafood that does not negatively affect global communities or the environment"[13]

26.     In reality, Walmart knew or should have known the Products are harvested using unsustainable fishing practices that harm fish populations and kill marine life, such as critically endangered right whales, endangered Stellar sea lions, seals, dolphins, otters, seabirds, and sharks.

**A.     Walmart's Products are Harvested Using Commercial Fishing Practices that are Environmentally Destructive, Irresponsible, and Inhumane**

27.     In purchasing Walmart's Products with the Sustainability Promise, reasonable consumers expect that Walmart would maintain the proper, company-wide monitoring to follow the explicit promises it makes regarding the alleged sustainable fishing practices used to source the Products. Failure to police MSC's blatant unsustainable practices violates the explicit Sustainability Promises Walmart makes to consumers.

28.     Walmart failed to conduct its own proper, company-wide monitoring to confirm the Products' labeling was truthful, and instead doubled down on the MSC certification. In 2006,

---

[13] Walmart Policies and Guidelines (2023), https://corporate.walmart.com/policies (last visited January 30, 2023).

Walmart executives promised that all of the seafood they sold in the U.S. would be MSC-certified by 2012.[14]

29.     Walmart had an obligation to consumers to ensure that its prominent Sustainability Promise followed a reasonable consumer's expectation of sustainable seafood. Certainly, Walmart knew it could not uphold that promise because it admits to using large scale fishing methods, employed by MSC fisheries and listed here, that indisputably harm the oceans and marine life.[15]

- Pots and traps: Durable lines attached to these traps entangle and injure critically endangered right whales and other marine mammals.

- Purse seines: These large nets encircle schools of fish and indiscriminately capture all marine life within the net severely injuring and killing seals, sharks, and endangered sea turtles.

- Gillnets: These large mesh nets not only capture fish by the gills but also capture any marine life and seabirds that get caught in their webbing and cannot escape, often dying slowly.

- Pelagic trawls: These large conical nets are dragged through the middle of the ocean and often capture and kill marine mammals that dwell at these depths.

- Bottom trawls: These giant industrial nets, dragged along the ocean floor, capture and injure or kill all life in their paths and at the same time destroy fragile habitats on the seabed.

---

[14] Daniel Zwerdling and Margot Williams, NPR Is Sustainable-Labeled Seafood Really Sustainable? (Feb. 11, 2013); https://www.npr.org/2013/02/11/171376509/is-sustainable-labeled-seafood-really-sustainable?t=1617527311964.

[15] https://oceandisclosureproject.org/companies/walmart.

- Longlines: These heavy-duty fishing lines that are miles long with thousands of harmful hooks catch target fish but also nontargeted species such as endangered sea turtles that slowly drown.

30. Additionally, overfishing and bycatch have contributed to the depletion of species such as snow crabs and salmon causing economic and environmental harm.

31. Furthermore, ghost gear—known as abandoned, lost and discarded fishing gear—is the deadliest form of marine plastic.[16] "Unfortunately, wherever fishing takes place, gear is being lost,"[17] and MSC fisheries (which Walmart employs) have not promulgated standards to prevent ghost gear.[18]

### 1.     **Walmart's Unsustainable Fishing Methods**

32. Walmart purchases its products from MSC-certified fisheries that catch fish and other types of seafood using pots and traps, purse seiners, gillnets, bottom trawls, pelagic trawls, and longlines.[19] As described herein, the MSC certification is deceptive and no reasonable consumer would deem these fishing practices sustainable.

33. Pots and traps are cylindrical, or rectangular, cages that are typically made of plastic. They are designed to capture lobsters and crabs. Extremely durable fishing ropes, often made of polypropylene, are tied to each trap and then attached to floating buoys so that fishers are able to locate the traps.

---

[16] Emma Bryce, An invisible killer': how fishing gear became the deadliest marine plastic, The Guardian (Nov. 7, 2022); https://www.theguardian.com/environment/2022/nov/07/invisible-killer-ghost-fishing-gear-deadliest-marine-plastic.

[17] Id.

[18] https://www.msc.org/standards-and-certification/developing-our-standards/the-fisheries-standard-review/projects/prevention-of-gear-loss-and-ghost-fishing.

[19] https://oceandisclosureproject.org/companies/walmart (last visited January 30, 2023).

34.     Walmart's certified "sustainable" lobsters and snow crabs are caught by fisheries operating in the North Atlantic that use pots and traps.[20] Entanglements with fishing lines and buoys are the leading cause of death for the critically endangered North Atlantic right whale.[21] Since 2012, dozens of right whales have suffered serious injury and death due to entanglements from these virtually indestructible fishing lines.[22] In 2019 and 2020, right whales suffered from 128 entanglements, causing the whales to become emaciated due to an inability to swim efficiently and nourish themselves.[23] Dead whales have also been found with gear wrapped around their heads, mouths, and flukes.[24]

35.     Expert Kate O'Connell, a marine wildlife consultant for the Animal Welfare Institute—referring to the crab and lobster lines—stated, "We're talking millions of lines, placed in the water every year. These animals are running the gauntlet – and it's getting harder and harder for them to survive."[25] Over a right whale's lifetime, 85% are expected to get entangled in gear.[26]

---

[20] https://fisheries.msc.org/en/fisheries/@@search?q=crab&term=&bucket=&search=search&__start__=fishery_name%3Asequence&__end__=fishery_name%3Asequence&__start__=uoc_status%3Asequence&__end__=uoc_status%3Asequence&__start__=species%3Asequence&__end__=species%3Asequence&__start__=gear_type%3Asequence&__end__=gear_type%3Asequence&__start__=location%3Asequence&__end__=location%3Asequence&__start__=certificate_number%3Asequence&__end__=certificate_number%3Asequence (last visited January 30, 2023).

[21]     https://www.cbc.ca/news/canada/nova-scotia/lobster-industry-threat-north-atlantic-right-whales-1.6576109 (last visited January 30, 2023).

[22] https://entangled-film.com/MYTHS (last visited January 30, 2023).

[23]     https://www.nationalfisherman.com/seafoodsource/whale-activists-file-objection-to-gulf-of-maine-lobster-fishery-certification (last visited January 30, 2023).

[24]     https://www.nrdc.org/experts/francine-kershaw/maine-lobster-ecolabel-loss-matters-beyond-right-whales (last visited January 30, 2023).

[25]     https://www.theguardian.com/environment/2021/jul/26/blue-ticked-off-the-controversy-over-the-msc-fish-ecolabel (last visited January 30, 2023).

[26] *Id.*

36.     A purse seiner is a large net that hangs down 650 feet deep from a floating circular top line as wide as a mile in diameter. The net is used to encircle a school of fish. The bottom is drawn tight to prevent fish from escaping and the net is hauled on board or dragged alongside the vessel.

37.     MSC-certified fisheries use purse seiners, a non-selective method of catching pink and sockeye salmon found on Walmart's shelves.[27] Once a purse seiner is set, all marine life within the net is captured, including marine mammals and sea turtles.[28] These non-target species are called bycatch. Most marine life in the purse seiner is crushed by the weight of other catch that has accumulated on top of them. The various forms of marine life caught in the net become stressed and injured, and often times they are thrown back into the ocean dead or as they are dying.[29]

38.     Gillnets are mesh nets that are wide enough to allow salmon to pass their heads and gills through the holes. Sadly, when these fish try to back out, they get stuck. Gillnets can be several miles long and up to 200 feet deep. They are hung below the ocean's surface for up to 14 hours.

39.     Walmart sells MSC-certified salmon that is caught with gillnets. However, these gillnets also capture an abundant amount of bycatch, including juvenile fish, sharks, seabirds, sea turtles, and cetaceans (*i.e.*, whales, dolphins, and porpoises).[30] Gillnets are hard to see and difficult

---

[27] https://oceandisclosureproject.org/companies/walmart (last visited January 30, 2023).

[28] NOAA, Fishing Gear: Purse Seines, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-purse-seines (last visited January 30, 2023).

[29] *Id.*

[30] World Wildlife Fund (WWF), *Bycatch*, https://www.worldwildlife.org/threats/bycatch#:~:text=NON%2DSELECTIVE%20FISHING%20GEAR&text=Longlines%2C%20trawling%20and%20the%20use,along%20a%20single%20fishing%20line (last visited January 30, 2023).

for cetaceans to detect through echolocation.[31] They are known to cause the highest amount of cetacean bycatch,[32] and are often lost at sea and rarely recovered, posing a significant risk to marine animals for many years.[33]

40.    An example of the harm caused by gillnets is evident in an MSC certified Icelandic fishery, that reportedly caught 269 harbor porpoises, 900 seals, and 5,000 seabirds.[34]

41.    The incidents of bycatch with gillnets are so great—up to 45% of untargeted species being discarded—they have led to the federal government banning gillnets in the U.S. with a plan to phase them out over the next five years.[35]

42.    A pelagic trawl is a large conical net with a horizontal opening that can be as wide as two football fields and as deep as 160 yards and is towed through midwater depths.

43.    A pelagic trawl is another non-selective method of catching fish that MSC-certified Alaskan pollock fisheries use.[36] When a pelagic trawl is dragged through the water, the net captures numerous species of marine life bycatch, including marine mammals.[37] Most marine mammals swim at mid-water depths, which puts them at high risk for being captured in these nets and crushed by the weight of catch on top of them.[38]

---

[31] *Id.*

[32] International Whaling Commission, *Bycatch*, https://iwc.int/bycatch (last visited January 30, 2023).

[33] WWF, *Bycatch*, *supra* n.30.

[34] *SEASPIRACY* (Ali Tabrizi dir., 2021); *ISF Icelandic cod Report Surveillance 3* (May 2021).

[35]    https://www.nationalfisherman.com/west-coast-pacific/new-federal-law-phases-out-large-mesh-drift-gillnets-for-california-swordfish (last visited January 30, 2023).

[36] https://oceandisclosureproject.org/companies/walmart (last visited January 30, 2023).

[37] NOAA, *Fishing Gear: Midwater Trawls*, https://www.fisheries.noaa.gov/national/bycatch/fishing-gear-midwater-trawls (last visited January 30, 2023).

[38] *Id.*

44.     Furthermore, pollock fisheries do not have an effective measure in place to protect endangered species, such as Steller sea lions and albatross.[39] Steller sea lions, an endangered species that occupy the Bering Sea, are prone to getting caught in these nets because they prey upon pollock. From 2016 to 2020, documented Steller sea lion deaths were generally linked to pelagic trawl incidents, and they made up the majority of marine mammals entangled in discarded fishing gear.[40]

45.     Bottom trawls are enormous and heavy conical nets and industrial gear that is dragged along the ocean floor. They are as wide as a football field and as deep as a three-story building.

46.     The bottom trawls used by MSC fisheries to catch Alaskan pollock, haddock, cod, and sea scallops, decimate the seabed floor, crushing, ripping up, and smothering every living thing in their paths, including corals that are 4,200 years old.[41] Up to 90% of coral in a trawl's path can be damaged,[42] and the destruction of the coral and other species in these biodiverse seabed habitats can take centuries to recover.[43] Across the globe, it is well known that bottom trawls

---

[39] Ivan Stupachenko, *Russia nets two new MSC certifications for shrimp and pollock*, Seafood Source (Sept. 9, 2021), https://www.seafoodsource.com/news/environment-sustainability/russia-nets-two-new-msc-certifications-for-shrimp-and-pollock (last visited January 30, 2023).

[40] Yereth Rosen, *Steller sea lions most likely victims of human-caused marine mammal deaths in Alaska*, Alaska in Brief (Aug. 18, 2022), https://alaskabeacon.com/briefs/steller-sea-lions-most-likely-victims-of-human-caused-marine-mammal-deaths-in-alaska/ (last visited January 30, 2023).

[41] Dirk Zeller *et al.*, *Global Marine Fisheries Discards: A Synthesis of Reconstructed Data*, 19 Fish and Fisheries 31 (2017); https://usa.oceana.org/bottom-trawling/ (last visited January 30, 2023).

[42] https://usa.oceana.org/bottom-trawling/ (last visited January 30, 2023).

[43] *Id.*

produce the greatest amount of bycatch that is then discarded.[44] Longline fishers roll out fishing lines up to 60 miles long. From these tremendously long lines hang thousands of large hooks for catching haddock.

47.     MSC-certified fisheries use <u>longlines</u> to catch Walmart's haddock.[45] Besides haddock, the hooks also capture and mortally wound sea turtles, sharks, and juvenile tunas.[46] Longline bycatch that are caught and discarded face a mortality rate of up to 50%.[47] Hundreds of thousands of endangered loggerhead turtles and critically endangered leatherback turtles drown annually on longlines.[48]

### 2.     Overfishing

48.     Due to the severe harm caused to fish populations from overfishing, no reasonable consumer would deem the fishing practices employed to obtain Walmart's Products as sustainable.

49.     The unsustainable pollock fishing practices with pelagic trawls have contributed to the dramatic decline in the population of snow crabs in the Bering Sea over the past five years.[49] Pollock trawl fisheries in the Bering Sea frequently catch snow crab as bycatch, which they then discard. However, these discarded crabs are estimated to have an 80% mortality rate.[50] These

---

[44] Dirk Zeller *et al*., *Global Marine Fisheries Discards: A Synthesis of Reconstructed Data*, 19 Fish and Fisheries 31 (2017).

[45] https://oceandisclosureproject.org/companies/walmart (last visited January 30, 2023).

[46] WWF, *Bycatch*, *supra* n.30.

[47] *Controversy Over Voluntary Environmental Standards: A Socioeconomic Analysis of the Marine Stewardship Council.*

[48] WWF, *Bycatch*, *supra* n.30.

[49] https://www.livescience.com/billions-snow-crabs-vanish-from-bering-sea (last visited January 30, 2023).

[50] North Pacific Fishery Management Council, Crab Bycatch (2022), https://www.npfmc.org/fisheries-issues/bycatch/crab-bycatch/#:~:text=Bycatch%20of%20crab%20occurs%20both,as%20groundfish%20and%20scallop%20fisheries (last visited January 30, 2023).

pelagic trawls, although they are supposed to catch pollock in midwater, scrape the bottom of the ocean floor as often as 80% of the time.[51] This contact with the seabed harms the benthic environment and crushes snow crabs that live in the path of the trawlers.[52] Tellingly, in the 2022 season, the population collapsed, decreasing by the billions. As a result, the snow crab harvest for 2022 was canceled causing extensive economic damage to the industry.[53]

50.     Additionally, the frequency in which sockeye and pink salmon are harvested has caused salmon populations to become depleted. These West Coast salmon have been under stress for years.[54] After offspring migrate to the ocean, they come back to spawn, but the number of returning fish are dwindling or uncertain.[55]

51.     From 2014 to 2019, U.S. Secretary of Commerce, Gina M. Raimondo, determined that overfishing of salmon, including sockeye and pink, amounted to a fishery disaster for tribal communities in Washington and California.[56] In response, the Secretary allocated $17.4 million to address the disaster.[57]

---

[51] Hal Bernton, *Into the ice: A crab boat's quest for snow crab in a Bering Sea upended by climate change*, Seattle Times (April 3, 2022), https://www.seattletimes.com/seattle-news/environment/into-the-ice-a-crab-boats-quest-for-snow-crab-in-a-bering-sea-upended-by-climate-change/ (last visited January 30, 2023).

[52] *Id.*

[53] https://www.livescience.com/billions-snow-crabs-vanish-from-bering-sea (last visited January 30, 2023).

[54] Erin Blakemore, *U.S. declares disaster for tribal salmon fisheries on the West Coast*, The Washington Post, (Sept. 10, 2022) https://www.washingtonpost.com/science/2022/09/10/tribal-fisheries-disaster/ (last visited January 30, 2023).

[55] *Id.*

[56] *Id.*

[57] *Id.*

52.     Much of Walmart's wild-caught salmon comes from the pristine waters off the Alaskan coast.[58] These Alaskan salmon fishing fleets catch large portions of salmon that are bound for British Columbia and shut out local fishers.[59] In 2020, the Washington State Recreation and Conservation Office found that several Pacific Northwest salmon species, including sockeye, are on the brink of extinction.[60]

53.     A reasonable consumer that purchases Products with a Sustainability Promise would not expect the fishing practices described herein to be implicated in the harvesting of seafood.

**B.      Contrary to Walmart's Sustainability Promise, the Labels on the Products Certified by the Marine Stewardship Council are False, Deceptive, and Misleading**

**1.      MSC's Race to Profit**

54.     Around the globe, consumers can fish products certified by the MSC. These products are stamped with the Blue Tick that states they are "certified sustainable seafood."

55.     The MSC is the world's largest (allegedly) sustainable seafood organization, and it markets itself as an industry leader with an aim to set sustainable fishing standards. The organization claims its mission is to use its ecolabel and its fishery certification program to recognize and reward sustainable fishing practices.

56.     However, experts are concerned that the rapid growth of the MSC and the inherent conflict of interest have influenced the MSC to compromise its objective.

---

[58] https://oceandisclosureproject.org/companies/walmart (last visited January 30, 2023).

[59] Stefan Labbe, *Alaskan fishers intercepting B.C. salmon at 'jarring' rate*, Ocean Conservancy (Jan. 11, 2022), https://www.vancouverisawesome.com/highlights/alaskan-fishers-intercepting-bc-salmon-at-jarring-rate-4943714 (last visited January 30, 2023).

[60] Washington State Recreation and Conservation Office, *2020 State of Salmon in Watersheds* (Dec. 2020).

57. Jim Barnes, director of the Antarctic and Southern Ocean Coalition, worries the MSC is straying from its mission and needs an overhaul.[61]

58. The MSC is out to make a profit. It charges retailers royalties starting at 0.5% of the net wholesale value of seafood sold for using its label.[62] Therefore, it naturally follows that the more fish and seafood that the MSC's customers sell, the more money the MSC earns.

59. The MSC has certified more than 30,000 seafood products globally.[63] Approximately 80% of the organization's income comes from licensing their logo on seafood products.[64] Fisheries that seek certification and the use of the MSC's "ecolabel" pay $20,000 to $100,000 USD.[65]

60. Chris Pincetich, a marine biologist with the Turtle Island Restoration Network, said, "The MSC has rushed to accept applications from hundreds of fisheries around the globe in order to grow their business and network. Many of those are actually viewed by scientists as unsustainable. They should really take a closer look before they even engage with those fisheries."[66]

---

[61] Daniel Zwerdling & Margot Williams, *Is Sustainable-Labeled Seafood Really Sustainable?* NPR (Feb 11, 2013), https://www.npr.org/2013/02/11/171376509/is-sustainable-labeled-seafood-really-sustainable?t=1617527311964 (last visited January 30, 2023).

[62] Marine Stewardship Council, *Apply to use the MSC label,* https://www.msc.org/for-business/use-the-blue-msc-label/apply (last visited January 30, 2023).

[63] Marine Stewardship Council, *Buy Sustainable Seafood,* https://www.msc.org/what-you-can-do/buy-sustainable-seafood (last visited January 30, 2023).

[64] *SEASPIRACY* (Ali Tabrizi dir., 2021).

[65] David Jolly, *Krill Harvest Certification Upsets Conservationists*, The New York Times, August 8, 2022, www.nytimes.com/2010/06/23/science/earth/23krill.html (last visited January 30, 2023).

[66] Richa Syal, *License to krill: the destructive demand for a 'better' fish oil*, The Guardian (Sept. 7, 2021), https://www.theguardian.com/environment/2021/sep/07/license-to-krill-the-destructive-demand-for-a-better-fish-oil (last visited January 30, 2023).

61.     Despite countless fisheries employing harmful practices that deplete fish populations, destroy habitats, and harm marine life, there have only been a handful that have ever been denied certification in over 20 years.[67]

62.     Professor Callum Roberts, a marine biologist in the Department of Environment and Geography, University of York, and Amy Hammond, Head of Research at Seahorse Environmental Communications, express the perception that "the bar has been dropped unacceptably low in order to satisfy ever-growing market demand by getting more (generally large industrial) fisheries into the program."[68]

## 2.      MSC's Fishery Standards

63.     The MSC defines sustainable seafood as seafood that comes from fisheries that catch fish in ways that ensure the long-term health of a stock or species and the wellbeing of the ocean.[69] Individual fishers or vessels cannot be MSC certified—only fishing operations.[70] According to the MSC's website, there are currently more than 400 wild capture fisheries certified to this standard.[71]

64.     MSC's Fishery Standards require:

- "Fishing must be at a level that ensures it can continue indefinitely and the fish population can remain productive and healthy."

---

[67] *SEASPIRACY* (Ali Tabrizi dir., 2021).

[68] Amy Hammond & Callum Roberts, *Why The Marine Stewardship Council Needs an Independent Review*, ETHICAL CONSUMER (July 31, 2019.) https://www.ethicalconsumer.org/food-drink/why-marine-stewardship-council-needs-independent-review (last visited January 30, 2023).

[69] Marine Stewardship Council, What does the blue MSC label mean? www.msc.org/what-we-are-doing/our-approach/what-does-the-blue-msc-label-mean (last visited January 30, 2023).

[70] *Id*.

[71] *Id*.

- "Fishing activity must be managed carefully so that other species and habitats within the ecosystem remain healthy."

### 3. MSC Violates Its Own Fishery Standards

65.     Walmart knows or should know that the MSC violates its fishery standards because it certifies fisheries that do not consider long term health of fish populations nor the health of other species.

66.     Gerry Leape, an oceans specialist at the Pew Environment Group, supported the MSC for more than a decade as a member of its advisory Stakeholder Council, but he and other critics say that the MSC has been certifying fisheries despite evidence that the target fish are in trouble, or that the fishing industry is harming the environment.[72]

67.     Over the past decade—despite evidence of severe injury and death caused by lobster and snow crab gear to the critically endangered North Atlantic right whale—the MSC has continued to certify fisheries using such gear.[73]

68.     In 2022, Kate O'Connell reported on the Gulf of Maine's lobster fishery certification, stating, "It is unconscionable that the leading seafood certifier in the world would give its seal of approval to a fishery that poses grave threats to a critically endangered species. Given that MSC's new fisheries standard—approved Friday, June 24—does not even require fisheries to achieve a progressive reduction in bycatch, the label is in serious jeopardy of losing its credibility."[74]

---

[72] Daniel Zwerdling and Margot Williams, *Is Sustainable-Labeled Seafood Really Sustainable?*, NPR (Feb. 11, 2013), https://www.npr.org/2013/02/11/171376509/is-sustainable-labeled-seafood-really-sustainable?t=1617527311964 (last visited January 30, 2023).

[73] Chris Chase, *Whale activists file objection to Gulf of Maine lobster fishery certification*, NF (June 30, 2022), https://www.nationalfisherman.com/seafoodsource/whale-activists-file-objection-to-gulf-of-maine-lobster-fishery-certification (last visited January 30, 2023).

[74] *Id.*

69.     "Indeed, The Monterey Bay Aquarium Seafood Watch program—another well-known seafood ecolabel—recently issued a science-based recommendation that consumers should avoid purchasing American lobster caught in the U.S. and Canada, [and] snow crab caught off Canada's Atlantic coast[] based on the [right whale] concerns."[75]

70.     The MSC certifies large scale fisheries—most of which use harmful fishing techniques, such as purse seiners, gillnets, longlines, and trawlers—that account for 93% of the MSC certified catch; the remaining 7% of catch comes from small fisheries.[76]

71.     The fishing methods used by the large fisheries cause overfishing and indiscriminately capture non-target species.

72.     The MSC has certified pollock fisheries, using pelagic trawls, that have failed to maintain healthy fish populations. These fisheries have caught excessive amounts of juvenile pollock as bycatch.[77] However, the MSC failed to consider these fisheries' harmful pelagic trawl practices, which have contributed to the decimation of the snow crab population in the Bering Sea.

73.     The MSC-certified fisheries in the Bering Sea lack scientific observer coverage and a comprehensive strategy to ensure endangered species, such as the Steller sea lion and albatross, are being protected.[78]

---

[75] Francine Kershaw, *Maine Lobster Ecolabel Loss Matters Beyond Right Whales*, NRDC (Nov. 18, 2022), https://www.nrdc.org/experts/francine-kershaw/maine-lobster-ecolabel-loss-matters-beyond-right-whales (last visited January 30, 2023).

[76] Frederic Le Manach *et al.*, *Small is beautiful, but large is certified: A comparison between fisheries the Marine Stewardship Council (MSC) features in its promotional materials and MS+C-certified fisheries,* (May 4, 2020); Marine Stewardship Council, *Fishing Methods and Gear Types*, https://www.msc.org/what-we-are-doing/our-approach/fishing-methods-and-gear-types (last visited January 30, 2023).

[77] https://www.mcsuk.org/goodfishguide/ratings/wild-capture/29/ (last visited January 30, 2023).

[78] MSC Fisheries Assessments, Fishery Shipowners Association (FSA) Western Bering Sea Walleye Pollock (May 31, 2022); MSC Fisheries Assessments, Western Bering Sea Pollock Public Certification Report (July 2021).

74. Bycatch levels are ignored by the MSC because, according to the organization itself, the levels are arbitrarily considered "sustainable."[79]

75. MSC purports to have observers on board that monitor bycatch. However, there is evidence that observers have reported about bycatch, shark finning, and bribery.[80] Such evidence includes images of shark finning and the capture of whale sharks, giant rays, and other species on MSC boats.[81] More graphically, fishers have left marine animals to die on the decks or butchered them in the nets while they were still alive.[82]

76. Abandoned, lost, or discarded fishing gear, also known as "ghost gear" is the deadliest form of plastic in the ocean and it greatly impacts marine life populations, including whales, dolphins, sharks, and sea turtles.[83] However, the MSC does not require the fisheries it certifies to provide effective strategies for mitigating ghost gear.

### 4. Expert Criticism of MSC Fishing Standards

77. Globally, researchers, academics, and scientists have criticized the MSC for disregarding its own standards and compromising its credibility.

78. Richard Page, a Greenpeace oceans campaigner, said decisions to certify some fisheries "seriously undermine" the MSC's credibility. "I will go as far as to say consumers are

---

[79] *SEASPIRACY* (Ali Tabrizi dir., 2021).

[80] J Schwenzfeier *et al.*, *Slipping Through the Net, Reported but Ignored: Infringements in the MSC tuna fisheries of the Western and Central Pacific.*, Shark Guardian (May 2022).

[81] *Id.*

[82] *Id.*

[83] Ingrid Giskes, *Ghost Gear Prevention in the Seafood Industry*, Ocean Conservancy (Feb. 2, 2021), https://oceanconservancy.org/blog/2021/02/02/ghost-gear-prevention-seafood-industry/ (last visited January 30, 2023).

being duped. They think they are buying fish that are sustainable and can eat them with a clean conscience."[84]

79.     Rory Crawford, the MSC's own advisory council and a member of Bird Life International, conducted a study of 23 fisheries in 2019 and found that only three were actively working to monitor and minimize bycatch. "Consumers cannot be fully confident that certified fish comes without impacts on non-target species, from sharks to seabirds to whales."[85]

80.     Gerry Leape, an ocean specialist at the Pew Environment Group, supported the MSC for more than a decade as a member of its advisory Stakeholder Council, but is now concerned, stating, "We would prefer they didn't use the word *sustainable*." He and other critics say that the MSC has been certifying fisheries despite evidence that the fish stocks are in trouble or that the fishing is harming the environment.[86]

81.     Daniel Paulie, a fisheries professor at the University of British Columbia, helped create the MSC, but now feels it is doing business for the industry, not the environment.[87] He has called for a complete ban of open-ocean fishing because it is essential to rebuilding globally depleted fish stocks and preventing the demise of the fishing industry.[88]

---

[84] Richa Syal, *License to krill: the destructive demand for a 'better' fish oil*, The Guardian (Sept. 7, 2021), https://www.theguardian.com/environment/2021/sep/07/license-to-krill-the-destructive-demand-for-a-better-fish-oil (last visited January 30, 2023).

[85] Karen Mc Veigh, *Blue ticked off: the controversy over the MSC fish 'ecolabel'*, The Guardian (July 26, 2021), https://www.theguardian.com/environment/2021/jul/26/blue-ticked-off-the-controversy-over-the-msc-fish-ecolabel (last visited January 30, 2023).

[86] Daniel Zwerdling & Margot Williams, *Is Sustainable-Labeled Seafood Really Sustainable?* NPR (Feb 11, 2013), https://www.npr.org/2013/02/11/171376509/is-sustainable-labeled-seafood-really-sustainable?t=1617527311964 (last visited January 30, 2023).

[87] *Id.*

[88] Richard Schiffman, *A Global Ban on Fishing on the High Seas? The Time Is Now*, Yale Environment 360 (Sept. 27, 2018), https://e360.yale.edu/features/a-global-ban-on-fishing-on-the-

### 5. The MSC's Certification Label is Present on the Packaging of Walmart's Products

82.     Despite the clear violations of sustainable fishing practices detailed herein, Walmart promotes its Great Value and Sam's Choice frozen fish and seafood by prominently placing a Sustainability Promise on its Products. With consumers willing to pay a price premium for sustainable seafood products, Walmart receives great financial benefit when it sells Products touted as "certified sustainable seafood" and bearing the MSC label. However, no reasonable consumer would consider such Products to be "certified sustainable seafood" if they knew that the seafood in question was obtained using the fishing practices detailed herein, or that the fishing practices employed to obtain such seafood were in violation of the certifier's own standards.

83.     Walmart's Products are obtained using methods that fail to contribute to the health of non-target species in marine ecosystems. The purse seine, gillnet, longline and other fishing techniques all indiscriminately catch and injure or kill excessive amounts of marine mammals, sea birds, and sea turtles.

84.     Walmart's Products come from fisheries that are not harvesting fish in ways that provide long-term healthy fish and seafood stocks. Instead, these fisheries contribute to overfishing and, given the acute impact they have on marine ecosystems, are cause for concern.

### III.    Walmart's Sustainability Promise is Material to Consumers

85.     The FTC has specifically acknowledged that "sustainable" claims are material to consumers.[89]

---

high-seas-the-time-is-now#:~:text=the%20High%20Seas%3F-,The%20Time%20Is %20Now,of%20the%20fishing%20industry%20itself (last visited January 30, 2023).

[89] *FTC Sends Warning Letters to Companies Regarding Diamond Ad Disclosures*, *supra* n.5.

86.     Moreover, in 2013, the FTC submitted a comment outlining factors that the MSC should consider to ensure that its "certified sustainable seafood" label complies with the FTC Act and the agency's Green Guides. The comment particularly emphasized that the MSC's standards be grounded in sound science and that the organization, or any other third-party certifier, should consider consumer protection when developing or reviewing a certification system. Quoting the FTC's comment specifically, the agency advised, "If a certifier permitted practices that reasonable consumers found inconsistent with their interpretation of the seal, the certifier should change the seal or change the certification process to comport with that understanding. Therefore, the MSC … should take into account how reasonable consumers will perceive the MSC seal at the retail level."[90]

87.     Researchers have found that consumers seek out and are willing to pay significantly more for products labeled as "ecologically sustainable."[91]

88.     This finding is consistent with research that has found that "consumers are willing to pay to improve animal welfare and reduce undesirable environmental effects from fishing."[92]

## IV.     Impact of Walmart's Wrongful Conduct

89.     Walmart's Sustainability Promise deceives and/or is likely to deceive the public. Reasonable consumers have been, and continue to be, deceived into believing that Walmart's Products are harvested using sustainable fishing practices. Moreover, reasonable consumers have

---

[90] Donald S. Clark, *Marine Stewardship Council's Fishery Standards Review*, Federal Trade Commission, (May 2013).

[91] McClenachan *et al*., *supra* n.11.

[92] Ingrid Olesen *et al*., *Eliciting Consumers' Willingness to Pay for Organic and Welfare-Labelled Salmon in a Non-Hypothetical Choice Experiment*, 127 Livestock Sci. 218 (Feb. 2010), https://pubag.nal.usda.gov/catalog/775401 (last visited January 30, 2023).

been, and continue to be, deceived into believing that Walmart's Products are harvested in compliance with the MSC's Fishery Standards and other requirements.

90.     Consumers are unable to discover the true nature of Walmart's Products from the Product's packaging. Ordinary consumers do not have sufficient knowledge about the commercial fishing industry to know or ascertain that Walmart's Products are sourced using unsustainable practices that effectively destroy marine ecosystems and deplete fish stocks. Likewise, ordinary consumers do not have sufficient knowledge about Walmart's practices to know or ascertain whether Walmart is actually complying with the MSC's Fishery Standards and other requirements.

91.     Walmart knew or should have known that their Products are not sourced sustainably. In making false, deceptive, and misleading representations, Walmart intended to deceive reasonable consumers into buying and/or paying more for products marketed with a Sustainability Promise.

92.     Walmart's material misrepresentations and omissions set forth in this Complaint were disseminated uniformly to Plaintiffs and all Class Members through product packaging and labeling, exposing Plaintiffs and all Class Members to Walmart's false, deceptive, and misleading advertising and unfair, unlawful, and fraudulent business practices.

93.     When purchasing Walmart's Products, Plaintiffs relied upon Walmart's misrepresentations and omissions. Had Walmart not made a Sustainability Promise that was false, deceptive, and misleading, reasonable consumers would not have been willing to pay a price premium for the Products or would not have purchased the Products at all.

94.     Plaintiffs were injured at the time of purchase as they would not have paid a premium price or purchased Walmart's Products had Walmart made truthful advertising statements and disclosed material information concerning the fishing practices involved with its

Products, including its failure to comply with MSC standards and the supported use of its Blue Tick.

95.     Walmart's material misrepresentations and omissions set forth in this Complaint induced Plaintiffs into purchasing Walmart's Products, resulting in remittance from Plaintiff to the benefit of Walmart. Had Walmart advertised its Products truthfully, Plaintiffs would not have paid Walmart for its Products.

96.     Plaintiffs and Class Members have been, and will continue to be, deceived or misled by Walmart's false and misleading misrepresentations and omissions concerning the fishing practices used to source its Products.

97.     Plaintiffs and Class Members are reasonable consumers who have been injured by purchasing Walmart's Products. Because of Walmart's material misrepresentations and omissions in its statements and advertisements concerning its Products, including on product packaging and labeling, Plaintiffs and Class Members were harmed at the time of purchase.

98.     Walmart's misrepresentations and omissions were a material factor in influencing Plaintiff's and Class Members' decision to purchase Walmart's Products.

99.     Walmart's conduct has injured Plaintiffs and Class Members because Walmart's Products are not sustainably sourced, and do not even comply with the MSC's own standards. Rather, Walmart's fishing practices are known to be destructive, and Walmart failed to conspicuously disclose this reality to Plaintiffs and Class Members.

100.     Walmart continues to engage in the unlawful acts and practices set forth in this Complaint.

101.     Unless enjoined, Walmart's unlawful acts and practices described in this Complaint will continue.

## CLASS ACTION ALLEGATIONS

102.    Plaintiff Sanchez brings this matter on behalf of herself and those similarly situated. As detailed at length in this Complaint, Walmart orchestrated deceptive marketing, advertisement, and labeling practices. Walmart's customers were uniformly impacted by and exposed to this misconduct. Accordingly, this Complaint is uniquely situated for class-wide resolution.

103.    The Nationwide Class is defined as:

**All persons who purchased in the United States any of the Products, within the applicable statute of limitations, during the Class Period.**

104.    The Multi-State Consumer Protection Class is defined as:

**All persons who purchased in the State of Illinois or any state with similar laws[93] any of the Products, within the applicable statute of limitations, during the Class Period.**

---

[93] Plaintiff asserts that the other states with similar consumer fraud laws under the facts of this case include, but are not limited to: Arkansas (Ark. Code §§ 4-88-101, *et seq.*); Colorado (Colo. Rev. Stat. §§ 6-1-101, *et seq.*); Connecticut (Conn. Gen. Stat. §§ 42-110, *et seq.*); Delaware (Del. Code tit. 6, §§ 2511, *et seq.*); District of Columbia (D.C. Code §§ 28-3901, *et seq.*); Florida (Fla. Stat. §§ 501.201, *et seq.*); Hawaii (Haw. Rev. Stat. §§ 480-1, *et seq.*); Idaho (Idaho Code §§ 48-601, *et seq.*); Illinois (815 ICLS §§ 505/1, *et seq.*); Maine (Me. Rev. Stat. tit. 5 §§ 205-A, *et seq.*); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq.*); Michigan (Mich. Comp. Laws §§ 445.901, *et seq.*); Minnesota (Minn. Stat. §§ 325F.67, *et seq.*); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq.*); Montana (Mo. Code. §§ 30-14-101, *et seq.*); Nebraska (Neb. Rev. Stat. §§ 59 1601, *et seq.*); Nevada (Nev. Rev. Stat. §§ 598.0915, *et seq,*); New Hampshire (N.H. Rev. Stat. §§ 358-A:1, *et seq.*); New Jersey (N.J. Stat. §§ 56:8-1, *et seq.*); New Mexico (N.M. Stat. §§ 57-12-1, *et seq.*); New York (N.Y. Gen. Bus. Law §§ 349, *et seq.*); North Dakota (N.D. Cent. Code §§ 51-15-01, *et seq.*); Oklahoma (Okla. Stat. tit. 15, §§ 751, *et seq.*); Oregon (Or. Rev. Stat. §§ 646.605, *et seq.*); Rhode Island (R.I. Gen. Laws §§ 6-13.1-1, *et seq.*); South Dakota (S.D. Code Laws §§ 37-24-1, *et seq.*); Texas (Tex. Bus. & Com. Code §§ 17.41, *et seq.*); Virginia (VA Code §§ 59.1-196, *et seq.*); Vermont (Vt. Stat. tit. 9, §§ 2451, *et seq.*); Washington (Wash. Rev. Code §§ 19.86.010, *et seq.*); West Virginia (W. Va. Code §§ 46A-6- 101, *et seq.*); and Wisconsin (Wis. Stat. §§ 100.18, *et seq.*). *See Mullins v. Direct Digital, LLC*, No. 13-cv-1829, 2014 WL 5461903 (N.D. Ill. Sept. 30, 2014), *aff'd*, 795 F.3d 654 (7th Cir. 2015).

105. Plaintiff Sanchez also seeks certification, to the extent necessary or appropriate, of a subclass of individuals who purchased the Products in the state of Illinois at any time during the Class Period (the "Illinois Subclass") as follows:

**All persons who purchased in the State of Illinois any of the Products, within the applicable statute of limitations, until the date notice is disseminated.**

106. The Nationwide Class, Multi-State Consumer Protection Class, and Illinois Subclass are referred to collectively throughout the Complaint as the Class. and the members of the Classes are referred to as the "Class Members." Specifically excluded from the Classes are: (1) Defendant, any entity in which Defendant has a controlling interest, and its legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel. Plaintiffs reserve the right to amend the class definitions as necessary.

107. The Class is properly brought and should be maintained as a class action under Rule 23(a), satisfying the class action prerequisites of numerosity, commonality, typicality, and adequacy because:

108. **Numerosity**: Class Members are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are thousands of consumers who are Class Members that have been damaged by Walmart's deceptive and misleading practices.

109. **Commonality**: The questions of law and fact common to the Class Members, which predominate over any questions that may affect individual Class Members include, but are not limited to:

(a) Whether Walmart is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

(b)     Whether Walmart's misconduct set forth in this Complaint demonstrates that Walmart has engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of its Products;

(c)     Whether Walmart made false and/or misleading statements to the Class and the public concerning the contents of its Products;

(d)     Whether Walmart's false and misleading statements concerning its Products were likely to deceive the public; and

(e)     Whether Plaintiffs and the Class are entitled to money damages under the same causes of action as the other Class Members.

110.    **Typicality**: Plaintiffs are members of the Class. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased Walmart's Products. Plaintiffs are entitled to relief under the same causes of action as the other Class Members.

111.    **Adequacy**: Plaintiff Sanchez is an adequate Class representative because her interests do not conflict with the interests of the Class Members she seek to represent; her consumer fraud claims are common to all members of the Class and she has a strong interest in vindicating their rights; she has retained counsel that is competent and experienced in complex class action litigation and she intend to vigorously prosecute this action.

112.    **Predominance**: Pursuant to rule 23(b)(3), the common issues of law and fact identified above predominate over any other questions affecting only individual members of the Class. The Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Walmart's deceptive and misleading marketing and labeling practices.

113. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

(a) The joinder of thousands of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

(b) The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive—if not totally impossible—to justify individual actions;

(c) When Walmart's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

(d) This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

(e) Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

(f) This class action will assure uniformity of decisions among Class Members;

(g) The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation;

(h) Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by a single class action; and

(i)  It would be desirable to concentrate in this single venue the litigation of all plaintiffs who were induced by Walmart's uniform false marketing and advertising to purchase its Products as being good for the planet and eco-friendly.

114. Accordingly, this Class is properly brought and should be maintained as a class action under Rule 23(b)(3) because questions of law or fact common to Class Members predominate over any questions affecting only individual members, and because a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

## CLAIMS FOR RELIEF

**COUNT ONE**
**VIOLATION OF THE ILLINOIS**
**CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**815 Ill. Comp. Stat. 505/1, *et seq*.**
**(By Plaintiff Sanchez on Behalf of the Illinois Subclass)**

115. Plaintiff Sanchez incorporates the preceding paragraphs as if fully set forth herein.

116. Plaintiff Sanchez brings this action individually and on behalf of the Illinois Subclass.

117. In Illinois, the "Consumer Fraud and Deceptive Business Practices Act" 815 Ill. Comp. Stat. 505/1, *et seq*., prohibits "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' . . . ."

118.     Plaintiff Sanchez and the Illinois Subclass Members were injured by Walmart's deceptive misrepresentations, concealments and omissions and these misrepresentations, concealments and omissions were material and deceived Plaintiff Sanchez and the Illinois Subclass Members. Because Plaintiff Sanchez and the Illinois Subclass Members relied on Walmart's misrepresentations, concealments and omissions when purchasing Walmart's Products, they were injured at the time of purchase.

119.     Walmart does business in Illinois, sell and distribute their Products in Illinois, and engaged in deceptive acts and practices in connection with the sale of the Products in Illinois and elsewhere in the United States.

120.     The Products purchased by Plaintiff Sanchez and the Illinois Subclass Members were "consumer items" as that term is defined under the Illinois Consumer Fraud Act.

121.     Walmart engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 505/2 when they misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Walmart as set forth above concerning their Products, which has caused damage and injury to Plaintiff Sanchez and the Illinois Subclass Members. Plaintiff Sanchez and the Illinois Subclass Members were injured by Walmart's unfair and deceptive acts at the time of purchasing Walmart's Products.

122.     Walmart represented, directly or indirectly, that their Products were "sustainable" when, in reality, they are not.

123.     Walmart failed to disclose in their advertising statements the material fact that despite the uniform "sustainable" representations on the packaging of the Products, that they were, in fact, not "sustainable."

124.    Walmart knew or should have known that their "sustainable" representations were false and misleading, and that by omitting and failing to disclose the truth in their advertising, they were omitting material facts that would alter any reasonable consumer's decision to purchase the Products.

125.    Walmart's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

126.    Walmart intended Plaintiff Sanchez and the Illinois Subclass Members to rely on their deceptive acts when purchasing Walmart's Products.

127.    Walmart's deceptive acts proximately caused actual injury and damage to Plaintiff Sanchez and the Illinois Subclass Members at the time of purchase.

128.    Plaintiff Sanchez and the Illinois Subclass Members would not have purchased, or would have paid less for, Walmart's Products but for Walmart's material misrepresentations as described in this Complaint.

**COUNT TWO**
**VIOLATION OF THE ILLINOIS**
**UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**815 Ill. Comp. Stat. 510/2, *et seq*.**
**(By Plaintiff Sanchez on Behalf of the Illinois Subclass)**

129.    Plaintiff Sanchez incorporates the preceding paragraphs as if fully set forth herein.

130.    Plaintiff Sanchez brings this action individually and on behalf of the Illinois Subclass.

131.    The Illinois Deceptive Trade Practices Act ("UDTPA"), 815 Ill. Comp. Stat. 510/2, *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false

35

promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact."

132.    815 ILCS 510/2 provides in pertinent part that a "person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(5) represents that goods or services have . . . uses, benefits or quantities that they do not have . . .; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

133.    Walmart engaged in unfair and deceptive acts in violation of 815 Ill. Comp. Stat. 510/2 when it misrepresented and deceptively concealed, suppressed and/or omitted the material information known to Walmart as set forth above concerning its Products, which have caused damage and injury to Plaintiff Sanchez and the Illinois Subclass Members. Plaintiff Sanchez and the Illinois Subclass Members were injured by Walmart's unfair and deceptive conduct at the time of purchasing Walmart's Products.

134.    Walmart represented, directly or indirectly, that its Products were "sustainable," when, in reality, they are not.

135.    Walmart failed to disclose in its advertising statements the material fact that the Products are not "sustainable."

136.    Walmart knew or should have known that its "sustainable" representations were false and misleading, and that by omitting and failing to disclose the truth in its advertising, it was omitting material facts that would alter any reasonable consumer's decision to purchase the Products.

137. Walmart's deceptive acts occurred in a course of conduct involving trade and commerce in Illinois and throughout the United States.

138. Walmart's deceptive acts proximately caused actual injury and damage to Plaintiff Sanchez and the Illinois Subclass Members at the time of purchase.

139. Plaintiff Sanchez and the Illinois Subclass Members would not have purchased, or would have paid less for, Walmart's Products but for Walmart's material misrepresentations as described in this Complaint.

140. Walmart intended Plaintiff Sanchez and the Illinois Subclass Members to rely on its deceptive acts when purchasing the Products.

**COUNT THREE**
**VIOLATION OF STATE CONSUMER PROTECTION STATUTES**
**(By Plaintiff Sanchez on Behalf of the Multi-State Consumer Class)**

141. Plaintiff Sanchez incorporates the preceding paragraphs as if fully set forth herein.

142. Plaintiff Sanchez brings this action individually and on behalf of the Multi-State Consumer Class.

143. Plaintiff Sanchez and Multi-State Consumer Class Members have been injured as a result of Walmart's violations of the state consumer protection statutes listed above in paragraph 104 and footnote 93, which also provide a basis for redress to Plaintiff Sanchez and Multi-State Consumer Class Members based on Walmart's fraudulent, deceptive, unfair and unconscionable acts, practices and conduct.

144. Walmart's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Class.

145.     Walmart violated the Multi-State Consumer Class states' unfair and deceptive acts and practices laws by representing that its Products are "sustainable," when, in reality, they are not.

146.     Walmart's misrepresentations were material to Plaintiff Sanchez's and Multi-State Consumer Class Members' decision to purchase the Products or pay a premium for the Products.

147.     Walmart made its untrue and/or misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

148.     As a result of Walmart's violations of the aforementioned states' unfair and deceptive practices laws, Plaintiff Sanchez and Multi-State Consumer Class Members paid a premium for the Products.

149.     As a result of Walmart's violations, Walmart has been unjustly enriched.

150.     Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiff Sanchez and Multi-State Consumer Class Members are entitled to recover compensatory damages, restitution, punitive and special damages including but not limited to treble damages, reasonable attorneys' fees and costs and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**COUNT FOUR**
**UNJUST ENRICHMENT/QUASI-CONTRACT**
**(By Plaintiff Sanchez on Behalf of the Nationwide Class,**
**or in the Alternative, the Illinois Subclass)**

151.     Plaintiff Sanchez incorporates the preceding paragraphs as if fully set forth herein.

152.     Plaintiff Sanchez brings this action individually and on behalf of the Nationwide Class, or in the alternative, on behalf of the Illinois Subclass.

153.     Walmart's unfair and unlawful contract includes, among other things, making false and misleading representations and omissions of material fact, as set forth in this Complaint.

Walmart's acts and business practices offend the established public policy of Illinois, as there is no societal benefit from false advertising, only harm. While Plaintiff Sanchez and Nationwide Class Members were harmed at the time of purchase, Walmart was unjustly enriched by their misrepresentations and omissions.

154.     Plaintiff Sanchez and Nationwide Class Members were harmed when purchasing Walmart's Products as a result of Walmart's material representations and omissions, as described in this Complaint. Each Nationwide Class Member purchased Walmart's Products. Plaintiff Sanchez and Nationwide Class Members have suffered injury in fact and lost money as a result of paying a premium price for the Products and by purchasing the Products at all, and as a result of Walmart's unlawful, unfair, and fraudulent business practices.

155.     Walmart's conduct allows Walmart to knowingly realize substantial revenues from selling its Products at the expense of, and to the detriment of, Plaintiff Sanchez and Nationwide Class Members, and to Walmart's benefit and enrichment. Walmart's retention of these benefits violates fundamental principles of justice, equity, and good conscience.

156.     Plaintiff Sanchez and Nationwide Class Members confer significant financial benefits and pay substantial compensation to Walmart for their Products, which are not as Walmart represent them to be.

157.     Under common law principles of unjust enrichment and quasi-contract, it is inequitable for Walmart to retain the benefits conferred by Plaintiff Sanchez's and Nationwide Class Members' overpayments.

158.     Plaintiff Sanchez and Nationwide Class Members seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiff Sanchez and Nationwide Class Members may seek restitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Sanchez, on behalf of herself and the Class, prays for judgment as follows:

1.      Declaring this action to be a proper class action and certifying Plaintiff as the representatives of the Class under Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding monetary damages, including treble damages and statutory damages, to the extent permitted by law;

3.      Awarding punitive damages, to the extent permitted by law;

4.      Providing for any and all injunctive relief the Court deems appropriate;

5.      Awarding Plaintiff pre-judgment interest and post-judgment interest, to the extent permitted by law;

6.      Awarding Plaintiff and Class Members their costs and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts, and reimbursement of Plaintiff's expenses; and

7.      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: March 2, 2023

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**


By:  /s/ Gary M. Klinger
      GARY M. KLINGER

GARY M. KLINGER
  gklinger@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**
227 West Monroe Street, Suite 2100
Chicago, Illinois 60606
Telephone: (866) 252-0878

RACHEL L. SOFFIN
  rsoffin@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**
800 South Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone: (865) 247-0080

HARPER T. SEGUI
  hsegui@milberg.com
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**
825 Lowcountry Boulevard, Suite 101
Mt. Pleasant, South Carolina 29464

41

MELISSA S. WEINER
  mweiner@pwfirm.com
**PEARSON WARSHAW, LLP**
328 Barry Avenue South, Suite 200
Wayzata, Minnesota 55391
Telephone:   (612) 389-0600
Facsimile:   (612) 389-0610

DANIEL L. WARSHAW*
  dwarshaw@pwfirm.com
MICHAEL H. PEARSON*
  mpearson@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

ARI KRESCH*
  akresch@1800lawfirm.com
WENDY KERNER*
  wkerner@1800lawfirm.com
**KRESCH LEGAL SERVICES PR, PLLC**
1225 Avenida Ponce de Leon, Suite 605
San Juan, Puerto Rico 00907
Telephone: (800) 529-3476

* *Pro Hac Vice* Forthcoming

*Attorneys for Plaintiffs and the Proposed Class*